GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (SBN 212532)
  mperry@gibsondunn.com
RACHEL S. BRASS (SBN 219301)
  rbrass@gibsondunn.com
JULIAN W. KLEINBRODT (SBN 302085)
  jkleinbrodt@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile:  (415) 374-8429

*Attorneys for Apple Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CORING COMPANY, on behalf of themselves and all others similarly situated | Case No. 3:22-CV-01044-EMC |
| Plaintiffs, | **DEFENDANT APPLE INC.'S MOTION TO DISMISS COMPLAINT AND MOTION TO STRIKE; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| APPLE INC., | |
| Defendant. | Date:        May 5, 2022<br>Time:       1:30 p.m. PT<br>Place:       Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2

  **PLEASE TAKE NOTICE** that on May 5, 2022, at 1:30 p.m., or as soon thereafter as the

matter may be heard, in the United States District Court, Northern District of California, 450 Golden

3

Gate Ave., San Francisco, Courtroom 5, 17th Floor, Federal Courthouse, Defendant Apple Inc.,

4

through its undersigned counsel, will, and hereby does, move to dismiss and move to strike Plaintiff

5

The Coring Company's Complaint. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6), 12(f).  This Motion is sup-

6

ported by this Notice of Motion and Motion; the accompanying Memorandum of Points and Authori-

7

ties; the Declaration of Rachel S. Brass and exhibits thereto; the Proposed Order filed herewith; the

8

pleadings and papers on file herein; and such other matters that may be presented to the Court at the

9

hearing.

10

11

        By:   */s/ Rachel S. Brass*
            Rachel S. Brass

12

13

        GIBSON, DUNN & CRUTCHER LLP
        MARK A. PERRY (SBN 212532)

14

         mperry@gibsondunn.com
        RACHEL S. BRASS (SBN 219301)

15

         rbrass@gibsondunn.com
        JULIAN W. KLEINBRODT (SBN 302085)

16

         jkleinbrodt@gibsondunn.com
        555 Mission Street, Suite 3000

17

        San Francisco, CA 94105-0921
        Telephone: (415) 393-8200

18

        Facsimile:  (415) 374-8429

19

        *Attorneys for Apple Inc.*

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

**I. INTRODUCTION** ................................................................................................... 1

**II. BACKGROUND** ................................................................................................... 2

**III. STATEMENT OF ISSUES TO BE DECIDED** ................................................. 4

**IV. LEGAL STANDARD** ......................................................................................... 5

**V. ARGUMENT** ....................................................................................................... 5

    A.    Coring's Claims Are Precluded By This Court's Judgment (Counts I–VIII)............... 5

        1.    There Is An Identity Of Claims Between *Coring* And *Coronavirus Reporter* ......................................................................................... 5

        2.    Coring Is in Privity With The *Coronavirus Reporter* Plaintiffs ....................... 7

    B.    Coring Lacks Standing To Bring Any Of Its Claims (Counts I–VIII).......................... 8

    C.    Coring Fails To Plead Any Viable Antitrust Claim (Counts I–VI, VIII) .................... 9

        1.    Coring's Contradictory Market Definitions Cannot Stand (Counts I–VI, VIII) ......................................................................................... 9

        2.    Coring Fails To Allege A Duty To Deal (Counts I–VI, VIII) ....................... 12

        3.    Coring Does Not Allege Antitrust Injury (Counts I–VI, VIII) ..................... 14

        4.    Coring's Antitrust Claims Are Untimely (Counts I–VI, VIII)....................... 16

        5.    Coring's Antitrust Claims Fail For Additional Reasons (Counts I–VI, VIII) ....................................................................................... 16

    D.    Coring's Patent Claim Is Equally Deficient (Count VII)............................................ 19

        1.    The '847 Patent's Claims Are Ineligible............................................... 20

        2.    Coring Fails To Allege Any Infringement ............................................. 23

    E.    Coring's Class Allegations Should Be Struck ........................................................... 24

**VI. CONCLUSION** ............................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
836 F.3d 1171 (9th Cir. 2016)......................................................................................18

*Akamai Techs., Inc. v. Limelight Networks, Inc.,*
797 F.3d 1020 (Fed. Cir. 2015) ...................................................................................23

*Alice Corp. Pty. Ltd. v. CLS Bank International,*
573 U.S. 208 (2014)...........................................................................................1, 20, 22

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.,*
135 F.3d 740 (11th Cir. 1998).......................................................................................9

*Am. Needle, Inc. v. NFL,*
560 U.S. 183 (2010).....................................................................................................18

*Amchem Prods. Inc. v. Windsor,*
521 U.S. 591 (1997).....................................................................................................25

*Apostol v. CitiMortgage, Inc.,*
2013 WL 6328256 (N.D. Cal. Nov. 21, 2013)...............................................................8

*Apple, Inc. v. Psystar Corp.,*
586 F. Supp. 2d 1190 (N.D. Cal. 2008) .......................................................................10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................................5, 24

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC,*
843 F.3d 1225 (10th Cir. 2016)....................................................................................10

*Aurora Enters., Inc. v. NBC,*
688 F.2d 689 (9th Cir. 1982)........................................................................................16

*Aviation Upgrade Techs., Inc. v. Boeing Co.,*
78 F. App'x 623 (9th Cir. 2003) ..................................................................................15

*Bailey v. Allgas, Inc.,*
284 F.3d 1237 (11th Cir. 2002).....................................................................................17

*Bender v. LG Elecs. U.S.A., Inc.,*
2010 WL 889541 (N.D. Cal. Mar. 11, 2010)...............................................................23

*Best Cinema Corp. v. Fort Wayne Newspapers, Inc.,*
347 F. Supp. 328 (N.D. Ind. 1972)...............................................................................14

iii

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Big Baboon, Inc. v. SAP Am., Inc.*,
2018 WL 1400443 (N.D. Cal. Mar. 20, 2018)..................................................................23

*Big Sky Civil Tr. v. Oath Holdings, Inc.*,
2021 WL 4498964 (N.D. Cal. Feb. 19, 2021) ...................................................................8

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
681 F.3d 1323 (Fed. Cir. 2012)........................................................................................24

*Blix Inc. v. Apple Inc.*,
2020 WL 7027494 (D. Del. Nov. 30, 2020) .....................................................................18

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013)...............................................................................14

*Bourns, Inc. v. Raychem Corp.*,
331 F.3d 704 (9th Cir. 2003).......................................................................................14, 15

*Brazil v. Dell, Inc.*,
2008 WL 2693629 (N.D. Cal. July 7, 2008)......................................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977).........................................................................................................16

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014)........................................................................................23

*Celgard, LLC v. Shenzhen Senior Tech. Material Co. (US) Rsch. Inst.*,
2020 WL 7392909 (N.D. Cal. July 23, 2020)...............................................................20, 24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...........................................................................................................9

*Commil USA, LLC v. Cisco Sys., Inc.*,
575 U.S. 632 (2015).........................................................................................................24

*Coronavirus Rep. v. Apple Inc.*,
2021 WL 5936910 (N.D. Cal. Nov. 30, 2021)......................................................... *passim*

*Cyntegra, Inc. v. IDEXX Labs., Inc.*,
322 F. App'x 569 (9th Cir. 2009) .....................................................................................15

*David Orgell v. Geary's Stores, Inc.*,
640 F.2d 936 (9th Cir. 1981).............................................................................................16

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)........................................................................................21

1

**TABLE OF AUTHORITIES** (*continued*)

2

Page(s)

3

*Dewey v. Volkswagen Aktiengesellschaft,*
681 F.3d 170 (3d Cir. 2012)..............................................................................25

4

5

*Duff v. Kan. City Star Co.,*
299 F.2d 320 (8th Cir. 1962)..............................................................................15

6

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
363 F.3d 1263 (Fed. Cir. 2004)..........................................................................23

7

8

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.,*
845 F.3d 1357 (Fed. Cir. 2017)..........................................................................24

9

*Enfish, LLC v. Microsoft Corp.,*
822 F.3d 1327 (Fed. Cir. 2016)..........................................................................21

10

11

*Epic Games, Inc. v. Apple Inc.,*
2021 WL 4128925 (N.D. Cal. Sept. 10, 2021) .......................................12, 18, 19

12

13

*Flaa v. Hollywood Foreign Press Ass'n,*
2021 WL 1399297 (C.D. Cal. Mar. 23, 2021) ....................................................11

14

*Frank v. United Airlines, Inc.,*
216 F.3d 845 (9th Cir. 2000).................................................................................6

15

16

*FTC v. Qualcomm Inc.,*
969 F.3d 974 (9th Cir. 2020)....................................................................... *passim*

17

18

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.,*
723 F.3d 1019 (9th Cir. 2013).............................................................................14

19

*Grupo Dataflux v. Atlas Glob. Grp., L.P.,*
541 U.S. 567 (2004).............................................................................................9

20

21

*Hamilton v. Bank of Blue Valley,*
746 F. Supp. 2d 1160 (E.D. Cal. 2010).................................................................5

22

23

*Hicks v. PGA Tour, Inc.,*
897 F.3d 1109 (9th Cir. 2018).......................................................................10, 12

24

25

*Hodges v. WSM, Inc.,*
26 F.3d 36 (6th Cir. 1994)...................................................................................15

26

*In re Hotel Tel. Charges,*
500 F.2d 86 (9th Cir. 1974).................................................................................25

27

28

*House v. Mitra QSR KNE LLC,*
796 F. App'x 783 (4th Cir. 2019) ..........................................................................9

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Hovsepian v. Apple, Inc.*,
2009 WL 5069144 (N.D. Cal. Dec. 17, 2009) .................................................5

*Image Tech. Servs., Inc. v. Eastman Kodak*,
125 F.3d 1195 (9th Cir. 1997) ..................................................................15

*Intellectial Ventures I LLC v. Erie Indem. Co.*,
850 F.3d 1315 (Fed. Cir. 2017)..................................................................22

*In re ISO Antitrust Litig.*,
203 F.3d 1322 (Fed. Cir. 2000)..............................................................13, 15

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ..................................................................................19

*Kamm v. Cal. City Dev. Co.*,
509 F.2d 205 (9th Cir. 1975)......................................................................5

*Kaplan v. Burroughs Corp.*,
611 F.2d 286 (9th Cir. 1979)................................................................10, 11

*L.A. Land Co. v. Brunswick Corp.*,
6 F.3d 1422 (9th Cir. 1993) ......................................................................17

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..............................................................................8, 9

*Maximum Availability Ltd. v. Vision Sols., Inc.*,
2010 WL 11508470 (C.D. Cal. Dec. 16, 2010) .............................................17

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) ................................................................................22

*Melamed, M.D. v. Blue Cross of Cal.*,
2012 WL 122828 (C.D. Cal. Jan. 13, 2012) ..................................................8

*Meland v. WEBER*,
2 F.4th 838 (9th Cir. 2021) .......................................................................5

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016)..................................................................22

*Newcal Indus. Inc. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008)....................................................................12

*In re NFL's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019)....................................................................14

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013)............................................................................13

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998)............................................................................15

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)............................................................................10, 11, 15

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001)............................................................................5

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)............................................................................13

*Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*,
526 F.2d 1196 (9th Cir. 1975)............................................................................8

*Pistacchio v. Apple Inc.*,
2021 WL 949422 (N.D. Cal. Mar. 11, 2021)............................................................................12

*Pollack v. U.S. Dep't of Justice*,
577 F.3d 736 (7th Cir. 2009)............................................................................9

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997)............................................................................12

*QSGI, Inc. v. IBM Glob. Fin.*,
2012 WL 1150402 (S.D. Fla. Mar. 14, 2012)............................................................................9

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
890 F.2d 139 (9th Cir. 1989)............................................................................16

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)............................................................................17

*Resonate Inc. v. Alteon Websystems, Inc.*,
338 F.3d 1360 (Fed. Cir. 2003)............................................................................21

*Rick-Mik Enters. v. Equilon Enters., LLC*,
532 F.3d 963 (9th Cir. 2008)............................................................................19

*Ruiz Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016)............................................................................25

*Sanders v. Apple Inc.*,
672 F. Supp. 2d 978 (N.D. Cal. 2009)............................................................................24

**TABLE OF AUTHORITIES** (*continued*)

<u>Page(s)</u>

*Sayre v. Google, Inc.*,
2019 WL 6036703 (N.D. Cal. Nov. 14, 2019) ........................................................................ 18

*In re Schimmels*,
127 F.3d 875 (9th Cir. 1997) ........................................................................................... 5, 7

*Serv. Training, Inc. v. Data Gen. Corp.*,
963 F.2d 680 (4th Cir. 1992) ................................................................................................ 15

*SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999) ................................................................................................... 12

*Software Rsch., Inc. v. Dynatrace LLC*,
316 F. Supp. 3d 1112 (N.D. Cal. 2018) ............................................................................... 23

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) ................................................................................................ 14

*St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*,
457 So. 2d 1028 (Fla. Dist. Ct. App. 1984) ........................................................................... 9

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) .............................................................................................. 17

*Sumotext Corp. v. Zoove, Inc.*,
2016 WL 6524409 (N.D. Cal. Nov. 3, 2016) ....................................................................... 10

*Superior Indus., LLC v. Thor Glob. Enters. Ltd.*,
700 F.3d 1287 (Fed. Cir. 2012) ............................................................................................ 23

*Synopsys, Inc. v. ATopTech, Inc.*,
2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) ...................................................................... 24

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
322 F.3d 1064 (9th Cir. 2003) ....................................................................................... 5, 7, 8

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001) .............................................................................................. 10

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ....................................................................................................... 5, 7

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
546 F.3d 991 (9th Cir. 2008) ................................................................................................ 10

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
536 F. Supp. 2d 1191 (C.D. Cal. 2008) ................................................................................ 11

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Townshend v. Rockwell Int'l Corp.*,
2000 WL 433505 (N.D. Cal. Mar. 28, 2000) ................................................................13

*U.S. Airways, Inc. v. Sabre Holdings*,
938 F.3d 43 (2d Cir. 2019) ............................................................................................12

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) ..................................................................................20, 22

*In the Matter of Unbundled Access to Network Elements*,
20 F.C.C. Rcd. 2533 (2005) ...........................................................................................21

*Unigestion Holdings, S.A. v. UPM Tech., Inc.*,
412 F. Supp. 3d 1273 (D. Or. 2019) ...............................................................................17

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .........................................................................................19

*US for Use and Benefit of Wulff v. CMA, Inc.*,
890 F.2d 1070 (9th Cir. 1989) ..........................................................................................8

*Van Scoy v. Shell Oil Co.*,
1995 WL 232419 (N.D. Cal. Apr. 18, 1995) ....................................................................9

*Verizon Commc'ns. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .................................................................................................13, 18

*Vinole v. Countrywide Home Loans*,
571 F.3d 935 (9th Cir. 2009) ..........................................................................................25

*W. Radio Servs. Co. v. Glickman*,
123 F.3d 1189 (9th Cir. 1997) ..................................................................................5, 6, 7

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........................................................................................................25

*Whitepages, Inc. v. Isaacs*,
196 F. Supp. 3d 1128 (N.D. Cal. 2016) ................................................................. *passim*

*Whitepages, Inc. v. Isaacs*,
698 F. App'x 613 (Fed. Cir. 2017) .........................................................................1, 20, 21

**STATUTES**

15 U.S.C. § 15 ...............................................................................................................14

15 U.S.C. § 15b .............................................................................................................16

1

**TABLE OF AUTHORITIES** (*continued*)

2

<u>Page(s)</u>

3   35 U.S.C. § 102 ........................................................................................................21

4   35 U.S.C. § 271 ........................................................................................................23

5   Fla. Stat. § 617.0123 ..................................................................................................9

6   **OTHER AUTHORITIES**

7   Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and*
8   *Their Application* (5th ed. 2021)...............................................................................25

9   Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to*
    *Intellectual Property* (3d ed. 2020 supp.) ...............................................................18
10
    Wright & Miller, 13 Fed. Prac. & Proc. Juris. § 3530 (3d ed.)..................................9
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I. INTRODUCTION

2    Though the caption is new, this case is not.  On November 30, 2021, this Court dismissed the

3    seventh complaint in a series of cases brought against Apple Inc. by Jeffrey Isaacs or entities with

4    which he is associated.  *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021).

5    The Court's prediction that "an *eighth* amended complaint" would be futile, *id.* at *18, has now been

6    proven correct.  Before the ink was dry on the *Coronavirus Reporter* judgment, Isaacs recycled the

7    same claims and theories in a new lawsuit under the name "The Coring Company."  Knowing full well

8    what fate would await it in this Court, Coring sued in Florida even though neither it nor Isaacs was a

9    Florida resident at the time.  That attempted forum-shopping did not take, and the case has now been

10   transferred here in light of this Court's experience with the "previous . . . action involving [Coring's]

11   principal and similar claims."  Dkt. 36 at 5.  And as the Complaint admits, transfer to a court in "the

12   Ninth Circuit . . . prevent[s] redress from ever occurring" under binding precedent.  Compl. ¶ 105.

13   First, all of Coring's claims are precluded by fundamental principles of res judicata.  Most of

14   Coring's claims were actually asserted in Isaacs' (or his entities') prior litigation, and those that were

15   not could have been brought then.  He cannot simply form a new company and get a do-over.

16   Second, Coring lacks standing under Article III because it did not exist when it filed suit and

17   its "prototyped" app store has never been submitted to Apple for review or distribution.  Compl. ¶ 14.

18   Third, Coring's antitrust claims fail on their own terms.  Each is not only untimely but also runs

19   afoul of bedrock antitrust principles: Coring alleges no viable market, no antitrust injury, and no anti-

20   competitive conduct—just as Isaacs and his entities failed to do in *Coronavirus Reporter*.

21   Fourth, Coring seeks to resurrect patent claims deemed ineligible by the Federal Circuit.

22   *Whitepages, Inc. v. Isaacs*, 698 F. App'x 613 (Fed. Cir. 2017).  Isaacs' now-reissued patent ("the '847

23   Patent"), like its predecessor, is about looking up a name associated with a phone number—an abstract

24   idea that fails to recite any "inventive concept" and is therefore ineligible under *Alice Corp. Pty. Ltd.*

25   *v. CLS Bank International*, 573 U.S. 208 (2014).  Nor does Coring even plead any infringement.

26   Finally, Coring cannot maintain the putative classes it alleges.  The problems with classes of

27   "millions of Apple shareholders," "tens of thousands of independent app distributors," "and millions

28   [of] citizens concerned about Apple device hazards" are as varied as they are obvious.  Compl. ¶ 111.

A final judgment is just that—final.  This Court afforded Isaacs and his entities opportunity after opportunity to litigate their claims in *Coronavirus Reporter*.  If they perceive error in that ruling, they may try to convince the Ninth Circuit.  What they may not do is harass Apple with repetitive and vexatious lawsuits.  The Court should dismiss this case with prejudice.

## II. BACKGROUND

The "first iteration of this lawsuit," *Coronavirus Reporter v. Apple Inc.*, was filed in New Hampshire on January 19, 2021.  2021 WL 5936910, at *5.  Through amendments, voluntary dismissal, and transfer, that case wended its way here—soon joined by "a separate, nearly identical lawsuit" from Maine.  *Id.*  Once before this Court, the plaintiffs—Coronavirus Reporter, CALID, Primary Productions LLC, and Jeffrey Isaacs—asserted eleven causes of action against Apple Inc.  *Id.* at *4–5.

Although the complaint in *Coronavirus Reporter* "lack[ed] clarity," the gravamen was that the App Store's integrated business model—requiring that all native iOS apps be distributed through the App Store, adhere to Apple's guidelines, and be reviewed by Apple—unlawfully monopolized several proposed markets, including "app distribution" and "app" markets downstream from an alleged "US Smartphones" foremarket.  *Coronavirus Rep.*, 2021 WL 5936910, at *3, 7.  The plaintiffs challenged Apple's centralized model under Sections 1 and 2 of the Sherman Act, claimed iOS was an "essential facilit[y]," and argued that Apple "tied" elements of its software to its hardware.  *Id.* at *2–4.  The Court dismissed all claims—the "seventh complaint filed by one or more of these related plaintiffs, all making similar allegations and claims"—with prejudice, finding (among other things) that neither a relevant market nor antitrust injury had been alleged.  *Id.* at *5–6.

Even before the Court dismissed *Coronavirus Reporter*, Isaacs began threatening Apple with duplicative litigation.  Dkt. 25-16 at 1.  In subsequent emails, Isaacs' counsel Keith Mathews confirmed that Isaacs intended to "file[] a patent infringement claim against Apple in Florida."  Dkt. 25-16.  And on December 8—just one week after this Court's final judgment in *Coronavirus Reporter*—Isaacs and his counsel each reiterated in separate emails that they would sue Apple for "the patent central to the Florida case" as well as "RICO [and] antitrust."  Dkt. 25-18, at 1, 3.  The current lawsuit was filed in the Southern District of Florida on December 15, 2021.  Dkt. 1.

The ostensible plaintiff is now "The Coring Company."  Compl. ¶ 1.  That entity did not exist

when the complaint was filed.  Dkt. 35-5.  Rather, the litigation has been and remains driven by the same individual behind *Coronavirus Reporter*: Isaacs.  Coring has admitted that the "Florida inventor" affiliated with it in the Complaint, Compl. ¶ 10, is in fact Isaacs, Dkt. 31 ¶ 7.  Isaacs is named on the alleged patent, Dkt. 1-4, and Coring's patent claims are "Isaacs' patent claims," Dkt. 34 at 12.  And Coring's headquarters is the law office of its attorney—the same counsel who represented the plaintiffs in *Coronavirus Reporter*.  *Compare* Brass Decl, Ex. 5 *with* Brass Decl., Ex. 6.  Although Coring has not filed the required corporate disclosure—despite repeated reminders from Apple, Dkt. 20 at 1; Dkt. 25 at 6; Dkt. 35 at 3—the *only* people affiliated with Coring appear to be Isaacs and his lawyer.

Guided by the same person, this suit retreads claims this Court has already dismissed.  Again at issue is Apple's integrated business model through which native iOS apps, all of which must adhere to Apple's Guidelines and are subjected to rigorous review, are distributed through the App Store.  *Coronavirus Rep.*, 2021 WL 5936910, at *1; *see also* Brass Decl. Exs. 1–4 (Apple's Developer Agreement, Developer Program License Agreement ("DPLA") and Schedules, and Guidelines).  Coring (implausibly) alleges that it developed a rival app store, called the App Place, in the two weeks after dismissal of *Coronavirus Reporter*.  CR Dkt. 108-2 at 2.  And although Coring has "never applied for nor been in privity to any agreement with Apple," Compl. ¶ 171, the essential complaint here is the same as in *Coronavirus Reporter*: Apple's "exclusionary iOS design" and refusal to license "access to iOS users" violate the antitrust laws, Coring says, by preventing developers from using third-party app stores to distribute apps across Apple's proprietary platform.  Compl. ¶¶ 15, 159.

All of Coring's antitrust claims ultimately rest on resurrecting Isaacs' theory that "[A]pple is a monopsony purchaser of iOS apps," which purchases apps from developers (through the App Review process) and then effectively resells them to consumers.  Compl. ¶¶ 99, 105, 170; *see also Coronavirus Rep.*, 2021 WL 5936910, at *12–13 (rejecting theory).  From this, Coring claims that Apple monopolized markets for "apps" or "app distribution"—just like in *Coronavirus Reporter*.  *See* Compl. ¶¶ 99, 100; *Coronavirus Rep.*, 2021 WL 5936910, at *3.  Coring claims that the DPLA restrains trade in those same markets—just as the plaintiffs in *Coronavirus Reporter* claimed.  *See* Compl. ¶¶ 122, 132; *see also Coronavirus Reporter, et al v. Apple Inc.*, No. 4:21-cv-05567, Dkt. 41 ¶¶ 198–21 ("CR FAC").  And Coring's essential facilities and tying claims are lifted near-verbatim from *Coronavirus Reporter*.

*Compare* Compl. ¶¶ 150–61 *and* 163–74, *with* CR FAC ¶¶ 181–94 *and* 214–30.

Coring has conceded that this lawsuit constitutes Isaacs' attempt to relitigate the theories and arguments that this Court already considered and rejected.  As Coring admits, it refused to sign the DPLA to avoid the forum-selection clause selecting venue in this Court.  Compl. ¶ 171.  It then brought suit in Florida for the express purpose of avoiding this Court's judgment.  *Id.* ¶¶ 96–97.  And in "the Ninth Circuit," it admits, no "redress [could] ever occur[]."  *Id.* ¶ 105.

The Complaint also tacks on Isaacs' threatened patent claim, Compl. ¶¶ 176–80, which he has said is part of *Coronavirus Reporter*, Dkt. 34 ¶ 12.  Like its predecessor, which was rightly adjudged ineligible, the '847 Patent seeks to protect a system for retrieving Caller ID information after a call through the same process long-used for retrieving that information during the call.  '847 Patent at 2:49–51 & Claims 7 & 9; *see also Whitepages, Inc. v. Isaacs*, 196 F. Supp. 3d 1128, 1129 (N.D. Cal. 2016).  Coring claims on "information and belief" that Apple distributes unnamed infringing apps on the App Store and that Apple's own unnamed "system" also somehow infringes the patent.  Compl. ¶ 60.

On February 18, 2022, the United States District Court for the Southern District of Florida transferred this case here because of "the existence of a previous Northern District of California action involving Plaintiff's principal [Isaacs] and similar claims."  Dkt. 36 at 5.  This Court then deemed this case related to *Coronavirus Reporter* on March 10, 2022.  Dkt. 43.

### III. STATEMENT OF ISSUES TO BE DECIDED

I.   Whether the Complaint should be dismissed under Fed. R. Civ. P. 12(b) because:

A.   Plaintiff's claims (Counts I–VIII) are precluded.

B.   Plaintiff has failed to allege Article III standing (Counts I–VIII).

C.   Plaintiff has failed to allege: a relevant antitrust market (Counts I–VI, VIII), a duty to deal under the Sherman Act (Counts I–VI, VIII), antitrust standing (Counts I–VI, VIII), monopoly power under Section 2 of the Sherman Act (Count I), concerted action under Section 1 of the Sherman Act (Count II), denial of access to an essential facility under Section 2 of the Sherman Act (Count V), and/or an unlawful tie under Section 1 of the Sherman Act (Count VI).

D.   All claims of the '847 Patent are ineligible pursuant to 35 U.S.C. § 101, and no infringement is pleaded (Count VII).

II.     Whether Plaintiff's putative class allegations should be struck under Federal Rule of Civil Procedure 12(f) because Plaintiff has failed to allege facts establishing adequacy, typicality, commonality, predominance, or superiority under Federal Rule of Civil Procedure 23.

## IV. LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead facts "invoking federal jurisdiction," *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021), as well as "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  Moreover, under Federal Rule of Civil Procedure 12(f), a court may "strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained." *Hovsepian v. Apple, Inc.*, 2009 WL 5069144, at *2 (N.D. Cal. Dec. 17, 2009); *see also Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 212–13 (9th Cir. 1975) (affirming order striking class allegations).

## V. ARGUMENT

### A.     Coring's Claims Are Precluded By This Court's Judgment (Counts I–VIII)

Under the auspices of a new entity, Isaacs has "returned to court and filed a new action essentially seeking relief from the same alleged wrongs [he] unsuccessfully protested before." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1078 (9th Cir. 2003).  But serial lawsuits are not a solution for the failed litigant.  Claim preclusion is "applicable whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).  It is beyond dispute that the Court's order dismissing all claims in *Coronavirus Reporter* is a final judgment on the merits.  *See In re Schimmels*, 127 F.3d 875, 884 (9th Cir. 1997).  Because there also is identity among claims and privity among parties, Coring may neither relitigate "any claims that were raised or could have been raised in the prior action," *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997), nor issues "actually litigated and resolved," *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).[1]

### 1.     There Is An Identity Of Claims Between *Coring* And *Coronavirus Reporter*

It is beyond reasonable dispute that this case and *Coronavirus Reporter* "arise out of the same

---

[1]  Coring's "claim" for a permanent injunction is in fact "a remedy and not, in itself, a cause of action." *Hamilton v. Bank of Blue Valley*, 746 F. Supp. 2d 1160, 1182 (E.D. Cal. 2010).

transactional nucleus of facts"—the "central criterion in determining whether there is an identity of claims." *Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000) (citation omitted).  Here, Coring complains that the App Store is the sole channel for distributing native iOS apps, giving Apple the alleged "ability to totally censor and control the apps that may be used on the iOS device network." Compl. ¶ 102; *see also*, *e.g.*, *id.* ¶¶ 76, 132, 154, 156.  That mirrors *Coronavirus Reporter*.  As this Court summarized, the complaint there "challenge[d] Apple's allegedly monopolist operation of its 'App Store' through 'curation' and 'censor[ship]' of smartphone apps."  2021 WL 5936910, at *1.

Four of Coring's claims "were raised" in *Coronavirus Reporter* and are thus inarguably precluded by the final judgment.  *W. Radio Servs. Co.*, 123 F.3d at 1192; *see also* Compl. ¶¶ 121–22; 132–34; 155; 164; *Coronavirus Rep.*, 2021 WL 5936910, at *4, 6.  Coring's tying claim is almost entirely copied-and-pasted from the *Coronavirus Reporter* complaint.  *Compare* Compl. ¶¶ 163–74, *with* CR FAC ¶¶ 214–30.  Coring's essential facilities claim is similarly lifted nearly word-for-word.  *Compare* Compl. ¶¶ 150–61, *with* CR FAC ¶¶ 181–94.  Coring's Section 1 claim asserts that "Apple forces developers to sign a DPLA that unreasonably restrict[s] competition," Compl. ¶¶ 132–33—indistinguishable from the Section 1 claim in *Coronavirus Reporter*.  *See* CR FAC ¶ 198 (alleging that the DPLA "unreasonably restrain[s] competition").  And Coring's monopolization claim under Section 2 contends that Apple has maintained a monopoly through "exclusionary design of iOS" and the DPLA, Compl. ¶ 122—just as the *Coronavirus Reporter* plaintiffs did, *see* CR FAC ¶¶ 165–74.

The similarities permeate every aspect of Coring's antitrust claims.  Take market definition. Coring alleges a "US Smartphones" foremarket as well as "app distribution" or "app" aftermarkets, Compl. ¶¶ 63, 89, 93.  Each of those was rejected in *Coronavirus Reporter*, 2021 WL 5936910, at *3, 7–13. So were Coring's theories regarding "institutional" app markets or "notary stamps, and onboarding software" markets.  *Compare id.* at *7–13 *with* Compl. ¶¶ 154, 169–70.

The same is true for antitrust injury.  The Court rejected a "ranking suppression" theory of injury in *Coronavirus Rep.*, 2021 WL 5936910, at *13–14—echoes of which remain in this case, Compl. ¶¶ 22, 109.  Likewise, the Court explained that Apple's rejection of certain apps is not tantamount to two-sided marketwide injury.  *Coronavirus Rep.*, 2021 WL 5936910, at *15.  Yet Coring

renews that same grievance here. Compl. ¶¶ 15, 19. Coring even relies on the same figures and comparators, citing an alleged 40,000 weekly app rejections and the size of Android app stores in China even though this Court considered and rejected those very arguments. *See* Compl. ¶¶ 7–8, 15, 85, 104; CR FAC ¶¶ 169, 174; *Coronavirus Rep.*, 2021 WL 5936910, at *14. Thus, Coring's suit asserts not just claims that were "raised in the prior action," *W. Radio Servs.*, 123 F.3d at 1192, but also issues "actually litigated and resolved," *Taylor*, 553 U.S. at 892.

Coring's only other antitrust claims—those asserted under Florida law—are derivative of its federal claims. *See* Compl. ¶¶ 139–48 (relying only on "preceding allegation[s]"). It is therefore irrelevant that they were not raised in *Coronavirus Reporter*; these claims "could have been" brought and are thus also precluded. *W. Radio Servs.*, 123 F.3d at 1192; *see also Tahoe-Sierra Pres. Council*, 322 F.3d at 1078 ("Newly articulated claims based on the same nucleus of facts may still be subject to a res judicata finding if the claims could have been brought in the earlier action.").

Like its Florida claims, Coring's final claim for patent infringement "could have been" brought in *Coronavirus Reporter*. *W. Radio Servs.*, 123 F.3d at 1192. Although the alleged patent was not reissued until December 7, 2021, Dkt. 1-4, Coring has admitted that its patent claim "relates" to and is "intertwined with" the "RICO and Sherman [Act]" conduct adjudicated in *Coronavirus Reporter*. Dkt. 31 ¶ 12. On that basis, Isaacs has indicated that he will ask the Ninth Circuit to allow him leave to assert the patent claim in that case. *Id.* He cannot have it both ways. If the claim could have been brought in *Coronavirus Reporter*, as Coring and Isaacs have argued, then it is precluded here. *See Tahoe-Sierra Pres. Council*, 322 F.3d at 1078.

## 2.    Coring Is in Privity With The *Coronavirus Reporter* Plaintiffs

"When the [named] parties [in two lawsuits] are not identical, privity may exist if there is 'substantial identity' between parties." *Tahoe-Sierra Pres. Council*, 322 F.3d at 1081 (quotation marks omitted). As courts have recognized, "privity is a flexible concept dependent on the particular relationship between the parties." *Id.* at 1081–82. It therefore exists where a party is "so identified in interest with a party to former litigation that [it] represents precisely the same right in respect to the subject matter involved." *In re Schimmels*, 127 F.3d at 881. That is the case here.

The real party in interest here is Isaacs. Isaacs threatened this lawsuit, *id.*; he is named on the

patent, Dkt. 1-4; the patent claims Coring asserts are in fact "Isaacs' patent claims," Dkt. 34 at 12; and Isaacs presumably authorized the initiation of this case given that Coring was not a legal entity when it filed suit, Dkt. 35-5; *see also* CR Dkt. 91 at 56 & Dkt. 95 at 1–2 (reconsideration motions underscoring Isaacs' centrality to Coring and relation between the two cases). Coring has even promised to insert Isaacs as a named plaintiff in this case. Dkt. 34 ¶ 9 n.1. In short, Coring is merely a stand-in for Isaacs himself—with the same interests and incentives. *See* CR Dkt. 108 at 2.

These facts establish privity. Courts across this Circuit have held that privity exists where, as here, a new action is "brought under [another] name" but the underlying entity is the same. *Big Sky Civil Tr. v. Oath Holdings, Inc.*, 2021 WL 4498964, at *5 (N.D. Cal. Feb. 19, 2021); *see also Melamed, M.D. v. Blue Cross of Cal.*, 2012 WL 122828, at *6 n.1 (C.D. Cal. Jan. 13, 2012) (privity where new entity's interests were "undisputed[ly] align[ed]" with individual plaintiff from prior action); *Apostol v. CitiMortgage, Inc.*, 2013 WL 6328256, at *5 (N.D. Cal. Nov. 21, 2013) (similar). Coring's interests, theories, and relief were shared, and "vigorously litigated," by the *Coronavirus Reporter* plaintiffs. *Tahoe-Sierra Pres. Council*, 322 F.3d at 1084. They cannot be reasserted now.[2]

## B.   Coring Lacks Standing To Bring Any Of Its Claims (Counts I–VIII)

Coring also lacks standing under Article III to assert any of its antitrust claims. A plaintiff must allege (1) injury in fact, (2) that is fairly traceable to defendant's conduct, and (3) redressable. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Coring argues that it has been deprived of "a chance to flourish" because Apple "disallow[ed]" the "App Place," a supposed alternative app store. Compl. ¶¶ 9, 19. Yet Coring concedes Apple never rejected the App Place. The App Place has only been "prototyped" and may at some uncertain date reach "patent pending status." Compl. ¶¶ 14, 40. Critically, this hypothetical app was never submitted to Apple, let alone rejected by it. *See id.* ¶¶ 105, 171. Worse, Coring does not offer even the "some day intentions" deemed insufficient in *Lujan*, 504 U.S.

---

[2] Beyond establishing privity, these facts raise concerns about Coring's ability to prosecute this case under Federal Rule of Civil Procedure 17(a)(1). That rule requires every case to be prosecuted in the name of the real party in interest "to protect a defendant from subsequent similar actions by one not a party to the initial action." *Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1208 (9th Cir. 1975). Because Coring did not exist at the time of filing, any claims belonged to Isaacs, and he was the only one (if any) "entitled to sue." *US for Use and Benefit of Wulff v. CMA, Inc.*, 890 F.2d 1070, 1074–75 (9th Cir. 1989). This too requires dismissal of Coring's claims unless or until Isaacs substitutes himself as plaintiff. *See id.*

at 564; it swears off any intent to submit its app and thus will never suffer the claimed injury of being rejected from the App Store, Compl. ¶ 105.  Any injury is therefore "purely speculative."  *Van Scoy v. Shell Oil Co.*, 1995 WL 232419, at *3 (N.D. Cal. Apr. 18, 1995); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[A]llegations of *possible* future injury are not sufficient.").

Although this is fatal to Coring's antitrust claims, there is an even more fundamental problem with the entire case.  Standing to sue is assessed "on the facts *as they exist when the complaint is filed*." *Lujan*, 504 U.S. at 569 n.4.  Coring did not exist at the time it filed its complaint: The "effective date" of its articles of incorporation was January 13, 2022—over four weeks after filing suit.  Dkts. 35-5 & 35-6; *see also* Fla. Stat. § 617.0123 ("[T]he document shall become effective on the date specified."). Whomever authorized this lawsuit therefore violated "[t]he most elemental requirement of adversary litigation": That there "be a real plaintiff at the inception of the [law]suit."  *House v. Mitra QSR KNE LLC*, 796 F. App'x 783, 787 (4th Cir. 2019); *accord* 13 Wright & Miller, Fed. Prac. & Proc. Juris. § 3530 (3d ed.) (collecting cases).  This is an incurable defect, for a plaintiff who cannot "establish standing at the time suit is filed . . .  cannot manufacture standing afterwards."  *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 742 n.2 (7th Cir. 2009).  Coring's lack of "legal existence at the outset of this litigation" deprives the Court of jurisdiction over this case.  *House*, 796 F. App'x at 788; *see also Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571, 582 (2004) (the "time-of-filing rule . . .  has a pedigree of almost two centuries" and must be adhered to "regardless of the costs it imposes").

## C.   Coring Fails To Plead Any Viable Antitrust Claim (Counts I–VI, VIII)

Even were they not precluded, Coring's antitrust claims fail several times over.  At the outset, Coring does not adequately allege a relevant market, a duty to deal, antitrust injury, or timeliness. Beyond these common defects, each of Coring's claims also falters on additional, individual grounds.[3]

### 1.   Coring's Contradictory Market Definitions Cannot Stand (Counts I–VI, VIII)

Defining the relevant market is a "threshold" pleading requirement.  *FTC v. Qualcomm Inc.*,

---

[3]  Through the Florida Antitrust Act (Fla. Stat. § 542.22) and Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.204), "the Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts."  *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So. 2d 1028, 1032 (Fla. Dist. Ct. App. 1984).  Arguments under federal law are therefore dispositive of Coring's state-law claims (Compl. ¶¶ 139–48).  *See, e.g.*, *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998); *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012).

969 F.3d 974, 992 (9th Cir. 2020).  That is because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (quotation marks omitted).  Plaintiffs therefore "must look at all relevant sources of supply," *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979) (quotation marks omitted), and draw the market's boundaries by reference to reasonable interchangeability of use and cross-elasticity of demand, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).

As in *Coronavirus Reporter*, Coring's markets are not alleged with "sufficient clarity" because "[o]ne cannot discern what is included and what is not" in each.  *Coronavirus Rep.*, 2021 WL 5936910, at *8; *see also Sumotext Corp. v. Zoove, Inc.*, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016) (dismissing antitrust claims because "the allegations of the relevant market [were] unclear").  For example, Coring first alleges at length that smartphones "made by companies like Apple, Samsung, LG, and Motorola" are "substitutable products" in its "smartphone foremarket."  Compl. ¶¶ 63–64, 93.  Yet it then claims that a small but significant and non-transitory increase in price ("SSNIP") test would prove Android and Apple devices are *not* substitutes after all.  *Id.* ¶ 66; *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) (explaining that a firm's ability to impose a SSNIP suggests products are not substitutes).  This makes it impossible to tell whether the market is supposed to be single-brand or multi-brand—neither of which is tenable given the conflicting allegations.  *See*, *e.g.*, *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (dismissing complaint where "allegations [were] internally contradictory" about whether substitutes existed).

Coring cannot even keep its own thread from one sentence to the next.  As to its "Smartphone App Market," Coring promises that it will "demonstrate that free apps are a relevant market."  Compl. ¶ 98.  Yet the very next sentence claims "there is a market for smartphone apps, free or paid."  *Id.*  Which is it?  The Complaint elsewhere supplies a third answer: "Coring's App Place specifically applies to non-gaming, United States apps."  *Id.* ¶ 7.  Like Samson's riddle, the answer is imperceptible to all but the author—leaving Apple and the Court in the dark as to the market's intended boundaries.  *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1244 (10th Cir. 2016); *see also*, *e.g.*, *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1064 (9th Cir. 2001) (affirming dismissal based on contradictory market definitions).

Exacerbating these internal inconsistencies, Coring's two alleged aftermarkets overlap and conflict with one another.  Coring defines its "App Distribution Market" to be the "channels" by which "iOS apps" (or, alternatively, all apps) "may be distributed to consumers." Compl. ¶¶ 80–81.  That is, it encompasses transactions in which smartphone users are "direct purchasers" of apps sold by developer "sellers" through "distributors" (like the App Store) acting as "market facilitators." *Id.* ¶ 75.  At the same time, *Apple* is "the only seller" of apps—selling directly to consumers—in the alleged "Smartphone App Market." *Id.* ¶ 99.  In other words, the two markets describe *the same transactions for the same apps* through irreconcilable paradigms: In one, the market "may or may not be a 'two-sided' transactional marketplace" where those sales occur between developers and users through a platform; in the other market, a single-sided transaction occurs between the platform and user alone.  *See id.* ¶¶ 75, 80–81, 99, 154.  These allegations leave the Complaint "hopelessly muddled as to what product market (or markets) are at issue here." *Flaa v. Hollywood Foreign Press Ass'n*, 2021 WL 1399297, at *7 (C.D. Cal. Mar. 23, 2021); *see also Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1195 (C.D. Cal. 2008) (dismissing complaint with overlapping, conflicting markets).

The reason Coring ties itself in such knots is clear: It refuses to reckon with the inescapable fact that the App Store is a two-sided transaction platform—as this Court recognized in *Coronavirus Reporter*, 2021 WL 5936910, at *12.  Likewise confronted with an alleged "smartphone market," "smartphone app distribution market," and "App market" (among others), the Court correctly recognized that none of those markets were viable where in substance the relevant market was "two-sided" and therefore "'best understood as supplying only one product—transactions—which is jointly consumed' by developers and consumers on opposing sides of the platform." *Id.* at *3, 12 (quoting *Amex*, 138 S. Ct. at 2286 n.8).  Accordingly, the scope of relevant transactions must be defined with reference to both sides of the platform. *Amex*, 138 S. Ct. at 2286–87.

None of Coring's markets are in keeping with these principles.  For example, "[a]uthorities far too numerous to cite or discuss in detail have established" that "[t]he principle most fundamental to product market definition is 'cross-elasticity of demand.'" *Kaplan*, 611 F.2d at 291.  Coring's only relevant allegations concern its promised SSNIP test.  Compl. ¶ 83.  But these allegations speak only to "a consumer[]"—ignoring developers. *Id.*  That says nothing about the relevant market here, as a

SSNIP test in a two-sided transaction market must "include simultaneous testing of both sides of the market" and "account [for] indirect network effects" between them. *Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *37 (N.D. Cal. Sept. 10, 2021); *see also Hicks*, 897 F.3d at 1120 (affirming dismissal of complaint where market was not alleged by reference to cross-elasticity of demand). The Complaint therefore contains *no* allegations explaining why game apps, fitness apps, puzzle apps, bible study apps, and every other kind of app are economically interchangeable—as Coring seems to assume. *See* Compl. ¶¶ 7, 98. Nor is there any explanation for why, as Coring likewise assumes, buying an app on one platform (e.g., the App Store) is not interchangeable with buying the exact same app on another (e.g., the Mac Store)—or even on the same App Store, but on an iPad rather than an iPhone, *id.* ¶ 65; *see also, e.g.*, *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) (complaint must allege why similar products "are not appropriate economic substitutes").

That the App Store is a two-sided transaction platform is doubly damning to Coring's attempt to draw iOS-only "app distribution" or "app" markets. Single-brand markets have been "disfavored" since "nearly the inception of modern antitrust law." *Coronavirus Rep.*, 2021 WL 5936910, at *9 (collecting authorities). As this Court observed, alleging such a market requires (among other things) well-pled allegations that "the restriction in the aftermarket [was] not . . . sufficiently disclosed." *Id.* at *10; *accord Newcal Indus. Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008). Coring's allegations about consumers, Compl. ¶ 83, do not suffice because they identify no way in which Apple "changed its policy after locking-in" consumers, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997), as is required where, as here, it is "obvious to any purchaser in the primary market" that Apple's ecosystem is closed, *SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999). But worse, Coring ignores the other side of the market altogether—offering no allegations about how developers could be locked into a single ecosystem. Because two-sided transaction platforms "must *always* include both sides of the platform," *U.S. Airways, Inc. v. Sabre Holdings*, 938 F.3d 43, 56 (2d Cir. 2019), these omissions are fatal to any single-brand theory.

### 2.      Coring Fails To Allege A Duty To Deal (Counts I–VI, VIII)

Another indispensable requirement to any antitrust claim is the allegation of "anticompetitive conduct." *Qualcomm Inc.*, 969 F.3d at 989–90. Although styled through six causes of action, Coring

advances one core complaint: That Apple will not license developers to distribute native apps to iOS users through third-party app stores. Compl. ¶¶ 15, 27, 102, 113, 154, 157–58. "Apple controls access to the iOS infrastructure," it alleges, by hardwiring these limits into iOS's "design." *Id.* ¶¶ 154, 157; *see also id.* ¶¶ 15, 113. Though Apple licenses certain intellectual property on specific terms under the DPLA, Coring alleges Apple does not and will not give "access" to iOS in the manner Coring seeks— withholding "necessary infrastructure" to prevent third-party app stores from distributing native apps on iOS. *Id.* ¶¶ 154–55. What Coring seeks here, therefore, is an order compelling Apple to redesign its platform and give Coring *additional* access to iOS that Apple has never licensed to any developer.

Seen for what they are, all of Coring's claims falter. Every firm is "free to choose the parties with whom they deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *see also Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 408 (2004); *Qualcomm Inc.*, 969 F.3d at 993. Those considerations apply with particular force here because intellectual property carries "the legal right to refuse to license." *Townshend v. Rockwell Int'l Corp.*, 2000 WL 433505, at *8 (N.D. Cal. Mar. 28, 2000). To impose a duty to deal is therefore not only inconsistent with the fundamental principle that "the Sherman Act [was] enacted for the protection of *competition*, not *competitors*," *Qualcomm Inc.*, 969 F.3d at 993 (cleaned up), but also with the privilege of the intellectual property owner, "if it pleases, [to] refrain from vending or licensing and content itself with simply exercising the right to exclude others from using its property," *In re ISO Antitrust Litig.*, 203 F.3d 1322, 1328 (Fed. Cir. 2000). Thus, companies "generally ha[ve] no duty to share (or continue to share) its intellectual . . . property with a rival." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013).

"[I]f a path to recovery lies anywhere" for Coring, it therefore "lies through the narrow eyed needle of refusal to deal doctrine." *Novell*, 731 F.3d at 1074. Yet Coring alleges none of the prerequisites for such a duty. For example, Coring has not alleged that Apple "terminated a voluntary and profitable course of dealing." *Qualcomm Inc.*, 969 F.3d at 994 (quotation marks and ellipsis omitted). To the contrary, Coring admits it "has never applied for nor been in privity to any agreement with Apple." Compl. ¶ 171. This alone is fatal, *Trinko*, 540 U.S. at 409, but there is more. Coring's admission that Apple doesn't "allow competing app stores" at all, Compl. ¶ 105, also makes clear that

Apple does not license the rights Coring seeks "in the existing market to other similarly situated customers." *Qualcomm Inc.*, 969 F.3d at 994.  Nor are there any allegations to suggest Apple sought "to sacrifice short-term benefits in order to obtain higher profits in the long run." *Id.* at 994.

Coring likens all this to a "book publisher banning books." Compl. ¶ 157.  But just as a newspaper need not publish in its classifieds an advertisement that violates its content policies, *Am.'s Best Cinema Corp. v. Fort Wayne Newspapers, Inc.*, 347 F. Supp. 328, 333–34 (N.D. Ind. 1972), a publisher need not accept a manuscript it does not want to publish.  *See Coronavirus Rep.*, 2021 WL 5936910, at *15.  Yet even this analogy understates the reach of Coring's theory.  Coring's claims are akin to requiring a publisher to give its rival free access to its printing press, customer list, and good will simply because that competitor does not like other methods of distributing books to the public.  For good reason, no such duty exists.  *See Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 623 (S.D.N.Y. 2013) (dismissing claim that Amazon did not allow plaintiffs "to sell e-books on Amazon's devices and apps").

### 3.    Coring Does Not Allege Antitrust Injury (Counts I–VI, VIII)

Coring also fails to plead a third threshold requirement: Antitrust injury.  *Somers v. Apple, Inc.*, 729 F.3d 953, 963–64 & n.5 (9th Cir. 2013).  A plaintiff must allege injury to "competition in the market as a whole"—such as marketwide reduction in output or increase in prices—"not merely injury to itself as a competitor" in the market.  *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013).  This alleged harm also must be "attributable to an anticompetitive aspect of the practice under scrutiny"; "harm that could have occurred under the normal circumstances of free competition" does not suffice.  *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019).  Coring's theory of injury—that Apple "foreclose[s] potential competition from alternative means to download apps," Compl. ¶ 72—fails for three reasons.

*First*, private plaintiffs may sue under the Sherman Act only if they have been "injured in [their] business or property." 15 U.S.C. § 15.  But a "'nascent' business" like Coring is "merely a gleam in the eye and a hope in the heart of its promoters"—lacking the "property to which antitrust injury can be done." *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 712 (9th Cir. 2003).  Coring did not exist when it brought this lawsuit, Dkt. 35-5, and even now only hopes to obtain "patent pending status on

the App Place" in the future, Compl. ¶ 40; *see also Duff v. Kan. City Star Co.*, 299 F.2d 320, 324 (8th Cir. 1962) (affirming dismissal where plaintiff claimed injury to intellectual property but "no trademark registration was ever made").  Nor has Coring attempted to bring the App Place to iOS, Compl. ¶ 171, or even to Android platforms where third-party app stores are allowed, *id.* ¶ 42.  This falls far short of "substantial demonstrable steps to enter an industry" that would suggest Coring is "ready to be a competitor."  *Cyntegra, Inc. v. IDEXX Labs., Inc.*, 322 F. App'x 569, 572–73 (9th Cir. 2009) (no antitrust injury where plaintiff took "only preliminary steps to engage in its proposed business" and had not "consummated contracts with distributors or end-users"); *see also Bourns*, 331 F.3d at 711–12 (similar); *Aviation Upgrade Techs., Inc. v. Boeing Co.*, 78 F. App'x 623, 624 (9th Cir. 2003) (similar).

*Second*, Coring's foreclosure theory is tied to its doomed single-brand market definitions.  As Coring admits, other platforms—like those operated by Microsoft and Google—allow "competing app stores."  Compl. ¶ 42.  Unless the market consists of Apple alone, Apple's restrictions cannot *a fortiori* foreclose competitors.  That is because Coring could operate its store on a substitute platform, and in such a market, Apple's restraint, which applies only to the App Store, would foreclose nothing at all; if the App Place facilitated superior transactions at cheaper prices on Android, developers and users would abandon Apple's App Store in favor of Coring's.  *See Amex*, 138 S. Ct. at 2295 ("[C]ustomers will switch to substitutes rather than pay . . . higher prices.").

*Third*, any alleged foreclosure stems from Apple's "lawful refusal to grant [Coring] access to [its] private property," not from any alleged conduct that could "violat[e] . . . the antitrust laws." *Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994).  Apple may "lawfully license [its intellectual property] to whomever it chooses."  *Serv. Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 686 (4th Cir. 1992).  That includes no one at all, at least absent an allegation that Apple's protection of its intellectual property is pretextual.  *Image Tech. Servs., Inc. v. Eastman Kodak*, 125 F.3d 1195, 1219 (9th Cir. 1997).  Coring thus claims injury that "flow[s] not so much from a less competitive market . . . as from the exercise of market power that is *lawfully* in the hands of" Apple by operation of law, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998).  If that is injury at all, it is not antitrust injury.  *See In re ISO Antitrust Litig.*, 203 F.3d at 1324 (rejecting claim "relying on injury solely caused by Xerox's lawful refusal to sell or license patented parts and copyrighted software").

Any other attempts at alleging antitrust injury likewise fail. For example, Coring mentions that Apple charges a commission on certain transactions and curates the App Store. Compl. ¶¶ 75, 77, 104. These phenomena affect only those on the App Store; neither applies to Coring. *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 149 (9th Cir. 1989). Nor does Coring allege that Apple's commission or curation injure competition marketwide as this Court recognized in *Coronavirus Rep.*, 2021 WL 5936910, at *14–15. For example, Coring calls the commission "supracompetitive," Compl. ¶ 77, but its one-sided argument again "fails to grapple with the second side of the transaction market, consumers," *Coronavirus Rep.*, 2021 WL 5936910, at *14. And Apple's "decisions as to which apps are allowed to sell through the App Store is not an act that in itself causes harm the antitrust laws were designed to protect." *Id.* at *15. The mere fact that Coring cannot operate the App Place in the manner it wants is not antitrust injury, lest the Sherman Act be hijacked to protect competitors over competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

### 4.   Coring's Antitrust Claims Are Untimely (Counts I–VI, VIII)

Coring's antitrust claims also fails for another reason: They are barred by the four-year statute of limitations. 15 U.S.C. § 15b. The Complaint concedes that the App Store has been the sole means of distributing native iOS applications since its inception in 2008. Compl. ¶¶ 15, 18–19, 29, 72. And Coring cannot blame its tardiness on its recent incorporation. It filed this lawsuit *before* incorporating, proving that it is one and the same with Isaacs—who has admitted that he was aware of and affected by the challenged restrictions almost a decade ago, *id.* ¶ 55; *see also* CR FAC ¶ 30. Any claims therefore expired well outside the limitations period (and any equitable relief is precluded by laches). *See Aurora Enters., Inc. v. NBC*, 688 F.2d 689, 693–94 (9th Cir. 1982); *David Orgell v. Geary's Stores, Inc.*, 640 F.2d 936, 938 (9th Cir. 1981).

### 5.   Coring's Antitrust Claims Fail For Additional Reasons (Counts I–VI, VIII)

Although Coring's failure to allege a relevant market, a duty to deal, or antitrust injury is dispositive, its antitrust claims fail on additional, independent grounds.

#### a.   Coring Does Not Allege Monopoly Power Under Section 2 (Count I)

Under Section 2, Coring must allege Apple possesses monopoly power in the relevant market. *Qualcomm Inc.*, 969 F.3d at 990. "A mere showing of substantial or even dominant market share alone

1  cannot establish market power sufficient to carry out a predatory scheme." *Rebel Oil Co. v. Atl. Rich-*

2  *field Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995).  Rather, Coring must allege that Apple "owns a dominant

3  share of [the relevant] market" *and* that "there are significant barriers to entry and show that existing

4  competitors lack the capacity to increase their output in the short run." *Id.* at 1434.

5          Outside of its futile attempt to rely on Apple-only markets, Coring fails to plead either.  Coring

6  alleges Apple's share only of the "Smartphone App Market," not the alleged "App Distribution Mar-

7  ket," Compl. ¶¶ 73, 87—dispositive on its own.  *See Unigestion Holdings, S.A. v. UPM Tech., Inc.*,

8  412 F. Supp. 3d 1273, 1286–87 (D. Or. 2019) (dismissing Section 2 claim where plaintiff failed to

9  allege monopoly power in one of two alleged relevant markets).  And Coring also fails to plead barriers

10 to entry in *either* market.  There are no allegations, for example, that Google cannot "quickly increase

11 [its] own output" if users and developers were to leave Apple's ecosystem en masse for Android.  *Rebel*

12 *Oil*, 51 F.3d at 1441.  Nor can Coring claim significant costs that "deter entry," *L.A. Land Co. v. Bruns-*

13 *wick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir. 1993) (quotation marks omitted), as its "group of former

14 Apple enthusiasts" allegedly developed a "vastly superior" platform in just two weeks, Compl. ¶¶ 14,

15 169.  The Complaint's only references to entry barriers concern the alleged "smartphone market," *id.*

16 ¶¶ 65, 165—not the app distribution or smartphone app markets Apple supposedly monopolized, *id.*

17 ¶ 121.  Without such allegations, Coring's Section 2 claim fails.  *Maximum Availability Ltd. v. Vision*

18 *Sols., Inc.*, 2010 WL 11508470, at *3 (C.D. Cal. Dec. 16, 2010).

19         Coring cannot sidestep these requirements by alleging Apple has "large profit margins" or the

20 "ability to control the price that consumers must pay to purchase an app."  Compl. ¶ 73.  As to the

21 former, "rates of return" reveal "very little about [defendant's] market power"—and have "yet to be

22 accepted by any circuit" as a measure of market power.  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252–

23 53 (11th Cir. 2002).  And the latter allegation is contradicted by the DPLA itself, which explains that

24 apps are "marketed . . . to End-Users at prices identified in a price tier and designated by [the devel-

25 oper], in [the developer's] sole discretion," Brass Decl. Ex. 3, Sch. 2, § 3.1; in fact, most developers

26 choose to make their apps free, Compl. ¶ 95; *see also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293,

27 1295–96 (9th Cir. 1998) (courts "are not required to accept as true conclusory allegations which are

28 contradicted by documents referred to in the complaint").

**b.      Coring Does Not Allege Concerted Action Under Section 1 (Count II)**

Section 1 of the Sherman Act prohibits only concerted action.  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010).  But the DPLA—the only contract mentioned, Compl. ¶ 131—does not satisfy that requirement here because its undefined "contractual constraints," *id.* ¶ 85, are strawmen untethered to Coring's actual theory of lability.  After all, Coring is not bound by the DPLA, *id.* ¶¶ 10, 171, yet still cannot put its alleged app store on iOS because Apple "denies access" to its "API[s] and SDK," *id.* ¶ 155.  As Coring's own alleged experience illustrates, the challenged restrictions exist whether or not one signs that contract; the DPLA does not deprive Coring of access it had *ex ante*, nor does it purport to restrict anyone from doing business with Coring that was otherwise free to do so.  *See Epic*, 2021 WL 4128925, at *99 (rejecting similar attempt to plead concerted action).  For these reasons, Coring seeks an injunction requiring Apple to alter the "design in iOS [that] block[s] competing app stores"—underscoring that this case is about Apple's alleged unilateral design decisions and concomitant refusal to give developers certain access to iOS, not any restriction in the DPLA.  Compl. ¶ 183.

**c.      Coring's Essential Facility Theory Fails for Myriad Reasons (Count V)**

An essential facilities "theory is a variation on a refusal to deal claim."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).  The doctrine has never been recognized by the Supreme Court, and Apple disputes its viability.  *See Trinko*, 540 U.S. at 411.  But even if such a claim can exist, Plaintiffs have failed to allege one because iOS is not an essential facility.  *See* Compl. ¶ 154.  Indeed, there has been "no case in which a United States court consciously held that an intellectual property right was itself an essential facility that must be licensed on reasonable and nondiscriminatory terms."  Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property* § 13.03 [C][2] (3d ed. 2020 supp.).  And even if intellectual property could be an essential facility, Coring has access to the market through other platforms that "allow[] any developer to act as a distributor."  Compl. ¶ 42.  "The availability of these other avenues of distribution, even if they are not the preferred or ideal methods, is dispositive of [Coring's] claim."  *Epic*, 2021 WL 4128925, at *113; *see also Blix*, 2020 WL 7027494, at *7; *Sayre v. Google, Inc.*, 2019 WL 6036703, at *3 (N.D. Cal. Nov. 14, 2019).

### d.     Coring Does Not Allege A Tie (Count VI)

Contrary to Coring's claim, Compl. ¶ 166, "the rule of reason, rather than per se analysis" governs Coring's tying claims because they involve "software that serves as a platform for third-party applications." *United States v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001).  Regardless, ties must link two separate products from two separate markets, *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 21 (1984), and thus "a tying claim cannot be sustained where the alleged good is not a 'separate and distinct product.'" *Epic*, 2021 WL 4128925, at *108 (quoting *Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963, 974 (9th Cir. 2008)).  Here, Coring alleges that Apple ties the App Store to iPhones.  Compl. ¶ 164.  That is the same theory advanced in *Coronavirus Reporter*, CR FAC ¶¶ 217–21, and fails for the same reason: The App Store is an integrated component of the iPhone, inherent in the "walled garden" ecosystem that differentiates Apple in the marketplace.  Compl. ¶¶ 42, 166.  Because the "aggregation" of hardware and software that is bought and sold—which includes the iPhone preloaded with the App Store—"is an essential ingredient of [Apple's] formula for success, there is but a single product and no tie in exists as a matter of law."  *Rick-Mik*, 532 F.3d at 974.

### D.     Coring's Patent Claim Is Equally Deficient (Count VII)

The '847 Patent is little different from its predecessor, which was ruled ineligible in *Whitepages, Inc.*, 196 F. Supp. 3d at 1129, *aff'd*, 698 F. App'x 613.  For many years, telephone systems have had the ability to present caller ID information including the calling party's phone number and, in some cases, the calling party's name (called "Caller Name Delivery" or "CNAM").  *See* '847 Patent at 1:48–2:3; '698 Patent at 1:40–61.  Caller Name Delivery is a four-step process: The system reads the calling party's number, determines which database contains information about the caller's number, accesses that database to retrieve the name associated with the number, and then returns that name. '847 Patent at 2:4–20; '698 Patent at 1:62–2:10.  This process has long been used to transmit callers' names "prior to the call completion" ('847 Patent at 2:17–20; '698 Patent at 2:7–10), Isaacs' supposed innovation is "post-page" retrieval—using this well-trod process to "obtain[] the CNAM Caller ID *after* the call" is complete.  '847 Patent at Abstract, 2:37–40; '698 Patent at Abstract, 2:26–29.  In this key respect, the '847 Patent is identical to its '698 predecessor: the newly-added technical jargon cannot hide the fact that the only change in the '847 Patent is limiting its claims to the specific context of

19

communications over a standard network (TCP/IP) using a particular kind of information database (LIDBs). '847 Patent at Cls. 7, 9.

The patent claim should be dismissed for two reasons. First, the '847 Patent's claims, like their '698 predecessors, are ineligible. Under Section 101 of the Patent Act, "abstract ideas are not patent-able." *Alice*, 573 U.S. at 216 (quotation marks omitted). Because the '847 Patent remains "directed to the patent-ineligible abstract idea of looking up a name associated with a phone number" and "lack[s] an inventive concept sufficient to transform the abstract idea into a patent-eligible application," it is likewise ineligible. *Whitepages*, 196 F. Supp. at 1133, 1135. This alone defeats Coring's claim.

But even if the '847 Patent were directed at patentable material, Coring has failed to plead infringement. Its allegations—founded only "[u]pon information and belief," Compl. ¶¶ 60–61—identify neither a specific infringing product nor even a specific instance of infringement. Because this "fails to provide fair notice," Coring's claim should be dismissed. *Celgard, LLC v. Shenzhen Senior Tech. Material Co. (US) Rsch. Inst.*, 2020 WL 7392909, at *2 (N.D. Cal. July 23, 2020).

**1.     The '847 Patent's Claims Are Ineligible**

**a.     The Claims Are Directed to the Abstract Idea of Searching a Database**

The first step to determine whether a patent is ineligible is whether the claims are directed to an ineligible "concept" such as an "abstract idea." *Alice*, 573 U.S. at 217–18. The idea of looking up a name associated with a phone number is no less abstract now than when it was deemed so in *Whitepages*. At most, the '847 Patent limits the '698 Patent's abstract idea to certain existing protocols and databases. That is like taking an abstract idea (*e.g.*, buy low, sell high), but limiting one's claims to using that abstract idea in a specific context (*e.g.*, the online vintage watch market).

In particular, the '847 Patent, like the '698 Patent, "[l]ack[s] concrete application grounded in new technology." *Whitepages*, 196 F. Supp. 3d at 1134–35 (citing *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 722 (Fed. Cir. 2014)). The concept at the core of the '847 Patent remains a so-called "SS7 interfacing node," used to transmit the CNAM query. '847 Cl. 7; *see also* Compl. ¶¶ 47, 59. But as the court in *Whitepages* held, Isaacs "did not invent the SS7 interfacing node, . . . and names can be accessed *only* by using the SS7 query," which is "such a common occurrence that the telecom industry simply refers to it as a name 'dip.'" *Whitepages*, 196 F. Supp. 3d at 1134. The SS7 interfacing node

20

is therefore not "an 'improvement' of the existing technology." *Id.*  Isaacs seeks to disguise this fact by describing the node in his reissued claim (Claim 7) only by its function.  *See* '847 Patent Cl. 7. Technical jargon, however, cannot hide that the idea remains as straightforward as it is abstract: The node transmits and retrieves caller name information using the same, four-step CNAM process at issue in the '698 Patent.  *Compare* '847 Cl. 7 *with* '698 Patent Cl. 1.[4]

Moreover, nothing about the "limitations" Isaacs added to the '847 Patent is novel.  They only limit the use of the abstract idea to certain contexts.  The "TCP/IP network interface" is merely "[t]he standard protocol suite used on the Internet," *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1362 n.1 (Fed. Cir. 2003), and "LIDBs" likewise are common "[c]all-related database[s]," *In the Matter of Unbundled Access to Network Elements*, 20 F.C.C. Rcd. 2533, 2681 (2005).  Isaacs acknowledges that the only other addition—"GR-1188," the specific kind of query relayed as part of the CNAM process—is prior art.  '847 Patent at 2:14–15; *see also* 35 U.S.C. § 102 (a claimed invention cannot be patented based on technology previously "available to the public").  In fact, the patent recites *no* improvement—technological or otherwise—to the manner in which information is transmitted over a standard TCP/IP network or to the manner in which a database is searched for the corresponding CNAM.  To the contrary, the '847 Patent itself acknowledges that caller identification systems that return CID and CNAM information for a calling party were well-known and routine for decades before the original application to which the '847 Patent claims priority was filed.  '847 Patent at 1:19–63.

At bottom, the '847 Patent, like its predecessor, merely suggests using a computer to perform an old task.  *Whitepages*, 196 F. Supp. 3d at 1133–34.  Any person in 2016 could (i) receive a telephone number from the TCP/IP network (*e.g.*, through a computer connected to the Internet), (ii) enter that phone number into the LIDB database to find the caller's name associated with the number, and (iii) return the result through the TCP/IP network (*e.g.*, over the internet) to a user.  *See Whitepages*, 196 F. Supp. 3d at 1133–34.  That is the hallmark of a patent-ineligible abstract idea.  *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016) ("[A] process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.");  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773

---

[4]  The other claims in the '847 Patent add nothing.  Claim 8 merely limits "the industry standard protocol" of Claim 7 to JavaScript Object Notation, which does not alter the abstract character of these claims.  Claims 9 and 10 are duplicative in substance of Claims 7 and 8.

F.3d 1245, 1259 (Fed. Cir. 2014) (examples of patent-ineligible abstract ideas include "applying a known business process to the particular technological environment of the Internet"); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims comprising "a [] interface" that allows borrowers to search a "database" and "display" results affirmed by the Federal Circuit as patent ineligible because "[t]he series of steps covered by the asserted claims . . . could all be performed by humans without a computer"); *Intellectial Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017) (claims invalid where "the heart of the claimed invention lies in creating and using an index to search for and retrieve data"). Without any specific improvement to this process using concrete application of new technology, the idea at the heart of the '847 Patent remains abstract. *See Ultramercial*, 772 F.3d at 722.

**b.     The Claims Lack an Inventive Concept Beyond the Abstract Idea Itself**

Because the '847 Patent is directed to an abstract idea, its claims can be valid only if they involve a specific "inventive concept" that "amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217–18. This requires "additional features" that show "the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* at 221 (quotation marks omitted). Such features must be more than "well-understood, routine, conventional activit[ies]." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 79 (2012). The '847 Patent contains nothing that could "transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (quotation marks omitted).

Nothing in the '698 Patent reflected features that transform its claims beyond the abstract. *Whitepages*, 196 F. Supp. 3d at 1135. To the contrary, Isaacs "concede[d] [he] did not create or improve the preexisting caller name databases." *Id.* at 1135–36. The *Whitepages* court found he did not "invent the SS7 technology used to query [the CNAM] databases . . . or the methods of looking up information on the internet referenced in the claim language." *Id.* Isaacs' purported "new solution" or "bridge" in fact "reduces to use of the internet, and that plainly cannot provide the requisite inventive concept." *Id.* And "the patent discloses no programming, algorithm, unique hardware, or technological or procedural improvements . . . no new website, no new app, no new networking equipment, and no new manner of querying a CNAM database." *Id.* Thus, "[a]t base, the patent describes nothing more

inventive than using a website to initiate the typical CNAM query." *Id.*

The '847 Patent shares the same specification as the '698 Patent.  The overall combination of steps is unchanged—found in *Whitepages* to "mirror[] the order in which those same elements appear in the specification's description of existing technology."  196 F. Supp. 3d at 1137.  And as noted above, the reissued claims only added routine, well-known elements or prior art.  Sending information over network remains "not even arguably inventive."  *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).  There is therefore no basis to contend that the '847 Patent reflects "an inventive concept sufficient to transform the abstract idea into a patent-eligible application."  *Whitepages*, 196 F. Supp. 3d at 1135.  Accordingly, the '847 Patent's claims are ineligible and cannot form the basis of any infringement claim against Apple.

### 2.     Coring Fails To Allege Any Infringement

Coring also fails to allege that Apple infringed the '847 Patent.  Compl. ¶ 176; *see also* 35 U.S.C. § 271.  Start with its allegation of direct infringement.  Direct infringement "occurs where all steps of a claimed method are performed by or attributable to a single entity."  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (per curiam).  To state such a claim, "a patent complaint must identify the specific products accused."  *Software Rsch., Inc. v. Dynatrace LLC*, 316 F. Supp. 3d 1112, 1116 (N.D. Cal. 2018) (quotation marks omitted).  Coring does not do so, referring only to Apple's unnamed "system."  Compl. ¶ 61.  That does not suffice.  *See*, *e.g.*, *Big Baboon, Inc. v. SAP Am., Inc.*, 2018 WL 1400443, *4 (N.D. Cal. Mar. 20, 2018); *Bender v. LG Elecs. U.S.A., Inc.*, 2010 WL 889541, at *4 (N.D. Cal. Mar. 11, 2010).

Coring's allegations of indirect infringement are equally lacking.  They rest on the similarly vague notion that the App Store sells "[n]umerous" unnamed apps that can lookup caller information.  Compl. ¶¶ 59, 61.  That itself is again fatal.  *See*, *e.g.*, *Superior Indus., LLC v. Thor Glob. Enters. Ltd.*, 700 F.3d 1287, 1296 (Fed. Cir. 2012) (affirming dismissal of induced and contributory claim that fell "far short of pleading facts necessary" under *Iqbal*).  But even if it were not, Coring fails to plead either an inducement or contributory theory.  Simply taking lawful steps to sell lawful products is not active inducement, *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1276 n.6 (Fed. Cir. 2004),

particularly where the plaintiff only attempts to allege "[m]ere knowledge of the acts alleged to constitute infringement" without "specific intent and action to induce infringement," *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357, 1368 (Fed. Cir. 2017).  And Coring fails even to allege that Apple *knowingly* contributed to patent infringement.  *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 640 (2015); *see also In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (contributory infringement requires the defendant to sell a product "known by the party 'to be especially made or especially adapted for use in an infringement of such patent'").  The most it musters is the bald assertion that "Apple has been made aware."  Compl. ¶ 177.  That is just a "[t]hreadbare recital[] of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678; *see also Synopsys, Inc. v. ATopTech, Inc.*, 2013 WL 5770542, at *16 (N.D. Cal. Oct. 24, 2013) (dismissing contributory infringement claim where knowledge was inadequately pleaded).

The problems with Coring's patent claim track those that led to dismissal in *Celgard*, 2020 WL 7392909, at *1.  There, as here, the plaintiff alleged multiple ill-defined theories of infringement.  *Id.* at *2.  There, as here, the complaint listed only "categories of products"—not any *specific* products— that allegedly infringed the patent.  *Id.* at *3.  There, as here, key allegations of infringement were prefaced as being "based 'on information and belief.'"  *Id.* at *2.  Because this constellation of vague, diffident, and conclusory allegations "fail[ed] to provide fair notice" of any specific infringement, the court dismissed both claims.  *Id.* at *1.  This Court should do the same here.

**E.   Coring's Class Allegations Should Be Struck**

If the Court allows any portion of the Complaint to survive dismissal, it should strike the two overly broad and conflict-ridden classes alleged: (1) "All U.S. iOS app distributors who were unable to compete with the App Store due to Apple's exclusionary design, and tying of the App Store to iOS devices" and (2) "[a]ll intellectual property holders (patent, trademark, and/or trade dress) who suffered censorship, ranking suppression, or lost royalties in Apple's App Store."  Compl. ¶ 109.  Even "on the facts alleged," these putative classes do not meet Rule 23's requirements.  *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990-91 (N.D. Cal. 2009).

Each putative class is facially defective.  The first is an impermissible fail-safe class that "pre-

clude[s] membership unless the liability of the defendant is established." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016). Determining who was "unable to compete" *because of* the challenged restrictions, Compl. ¶ 109, will require a trial about each individual putative class member's experience. *See Brazil v. Dell, Inc.*, 2008 WL 2693629, at *7 (N.D. Cal. July 7, 2008) (striking alleged fail safe class). The second putative class is equally flawed: Coring is neither typical nor adequate because it has not "suffered censorship, ranking suppression, or lost royalties in Apple's App Store," Compl. ¶ 109, and the putative class is rife with conflicts as "some [class] members"— *i.e.*, those whose apps were allegedly suppressed—"claim to have been harmed by the same conduct that benefitted other members of the class," *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 626 (1997).

For similar reasons, individualized issues will predominate in both classes. *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 947 (9th Cir. 2009). Coring says its classes include "millions of Apple shareholders, citizens, and tens of thousands of independent app distributors, and millions citizens [sic] concerned about Apple device hazards." Compl. ¶ 111. How these varied groups have any claim in this case is unclear. But at a minimum, each will have its own interests, own theories of liability, and its own measures of damages. *See In re Hotel Tel. Charges*, 500 F.2d 86 (9th Cir. 1974) (class unmanageable that involved "millions of plaintiffs" and "a great variety of individual questions"). And every single class member will require individualized inquiry. As but one example, determining who was "unable to compete" with Apple requires individualized analyses about each putative member's "financial ability to enter the market," the "steps toward entry" each had taken, whether their "background and experience [would] make[] success possible," and whether there was a "likelihood that real damage exists and can be reasonably measured." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 349a (5th ed. 2021). Nothing in the Complaint provides a basis to depart from "the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).

## VI. CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court dismiss the Complaint with prejudice and, to the extent any claims remain, strike Coring's class allegations.

1    Dated:    March 11, 2022               Respectfully submitted,

2                                   By:   */s/ Rachel S. Brass*

3                                          Rachel S. Brass

4

GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (SBN 212532)
  mperry@gibsondunn.com
RACHEL S. BRASS (SBN 219301)
  rbrass@gibsondunn.com
JULIAN W. KLEINBRODT (SBN 302085)
  jkleinbrodt@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile:  (415) 374-8429

*Attorneys for Apple Inc.*